Case number 13-7012, Gregory Bower, Appellants v. District of Columbia et al. Mr. Temple for the Appellants, Ms. Johnson for the Appellees. Thank you. All right, Mr. Temple, good morning. Before we begin, I would like to just make sure that we no longer have the two individual defendants. This is strictly, again, on appeal, strictly against the district, right? That's correct. And also, we have lost the 1983-1981 claim. That's correct, Your Honor. All right. Go ahead. Good morning. My name is Donald Temple, and I represent the Appellants, Greg Bowyer and Mr. Pennington. We are asking this Court to reverse the lower court's decision on the narrow whistleblower claim relative, particularly to the Bridgewater and the KS cases. The standard review is de novo here, and I want to just cut to the chase on this case. There's a lot of paper here. There are two fundamental questions here that we think the Court should look at, and the record is highly and intensely one of credibility on these questions. First and foremost, these are longstanding. Can I clarify one thing? You said you wanted to focus on Bridgewater and KA. Is that right? KS. KS is the minor. I thought it was KA. Okay. KA. I know what you're talking about. Sorry. Does that mean you're not pressing on appeal anymore in any of the other communications, or you simply just wanted to focus on those for argument? I wanted to focus on those two actions, which, for purposes of the whistleblower claims. Okay. Are you abandoning the others, or are you simply? You said the others, the other claims? You had a lot of other claims, too. Yeah, this is strictly on the whistleblower claim, yes. Okay. And I think our brief reflects that. But first and foremost, the court below relies significantly on the credibility of the attorney Collins and Sergeant Proctor. We think just at the outset, the record is clear here, and there is ample contradictory evidence here that shows that for purposes of the Bridgewater case, that there was, in fact, missing evidence, and that management knew as early as October 2007 that there was missing evidence by way of the fireworks at issue and the photograph that Mr. Boyer took of a backpack with a gun in it and fireworks that was located on the back of the car. This particular evidence was incriminating in one respect, but absent this evidence, the government could not get a conviction. Rather than disclose this to the opposing counsel, they refused to do so, but Mr. Boyer, after discovering that this evidence was missing, was insistent about bringing it to the attention of management. The court below indicated, and the question was relative to disclosures, how did that happen? I wanted to direct this court's attention, Mr. Boyer, by way of a communication to Deputy Chief Lee, by way of his own admission in the record, at A1046 and 1047. May I interrupt you with a question just to make sure I'm following your train of thought? What you call the Bridgewater allegations, what was the personnel action that grew out of those? It was a subsequent removal from his unit. When? When did that happen? That happened in August 2008. Oh, so you're saying the Bridgewater claim relates to the August 2008? Yes, Bridgewater and KS relate to August 2008. And it's our position that there are protective disclosures starting from October leading all the way up to June 2008 that are related to the improper charges. Did you make that argument in the district court? Yes, that argument. You made the argument in the district court that the allegations of what I'm calling the Bridgewater matter, that that was related to the August 2008 demotion? Yes, that was made in the record below. That was a substantial part of the argument below. And that's reflected as well in the statement of material facts proffered by the government and responded to by the plaintiff. Additionally... Can I ask you what exactly was the whistleblowing action? Was it the testimony in court or about the loss of the evidence or the disappearance of the evidence? What was the actual whistleblowing that was done? It was cumulative. It was the missing evidence, i.e. the fireworks. Well, the missing evidence is not whistleblowing. What is the action that was the whistleblowing? The disclosures. To whom? In court? No, not in court. All right, when? Disclosures were made to Chief Lee, number one. They were made to Mr. Palmer, number two. They were made by way of both appellants filed EEO complaint in June, internal EEO complaints, which were considered protected disclosures. The lower court conceded that the subsequent August EEO complaint was a protected disclosure, but the court did not reference the fact that earlier that Boyer and Pennington both made disclosures internal in the fire department's EEO office. What was the date of the internal EEO complaint? They were mid-June, June 21st and June 23rd. Of what year? 2008. The internal ones? Yes. In addition to that, there is a subsequent July exit interview where there is a communication to both of the appellants that there was an administrative review and that they had a certain period of time then to file the next step. It would have been 15 days. Before they filed the human rights claim independent and external to the office, they actually filed June 2008 internal complaints and there was a subsequent July exit interview, which suggests that management was aware of these particular disclosures. Subsequent to that, in August, they were removed from that particular unit. On that basis, the appellants submit that they made their prima facie case, their whistleblower case, i.e., they established that they were protected disclosures that were made to management on more than one occasion. In addition to that, court referenced the trial, the Bridgewater trial, which occurred, I believe, in February 2008. At that particular point in time, both Mr. Pennington, Mr. Pennington made a disclosure prior to that trial to the U.S. attorney who was assigned to prosecute the felony aspect of that case. The record shows, and we cited in our brief, Pennington's extensive comments to Mr. Graves at that time about the integrity of the evidence in that case and a subsequent communication by Mr. Pennington to management, which can be found at JA 1247. That's a separate communication to Mr. Palmer that occurred in January 2008. When were the communications to Mr. Graves? The communications to Mr. Graves were regarding the evidence that was missing. What was the date of those communications? Those communications to Mr. Graves were shortly before the trial time. That's somewhere between January and February 2008. 2008? Yes. And can you address the statute of limitations argument with respect to anything that happened before February 19, 2008? Well, as the lower court properly identified, the claims that we're presently arguing are within the statute of limitations, i.e. the actual removal of the appellate from their position, and additionally putting them on the Lewis list. I just want to make sure you're not asserting any claims before February 19, 2008. That's correct. However, we would submit that there's evidence that is relevant, though it may not be actionable, that would show, in this particular case, the state of mind of some of the actors. Before February 2008, there is a record that both Mr. Pennington and Mr. Brewer consistently reported impropriety to management, and that there was some resistance to it. My time looks like it's expiring here. All right. Ms. Johnson? Good morning. May it please the Court. Holly Johnson for the District of Columbia. The D.C. Office of the Attorney General decided that it could not sponsor the testimony of the two investigators because they had made false statements under oath, conducted a sloppy investigation, and violated the constitutional rights of a juvenile defendant. This information was given to Chief Rubin, and at that point, when he found out that these individuals would not be called to testify in court, he had no reasonable choice but to remove them from the Fire Investigation Unit. Otherwise, every case they investigated, the prosecution would be jeopardized. The plaintiffs have offered no evidence that any of their disclosures played any role in Chief Rubin's decision to remove them from FIU. Why doesn't the time between the EEO complaint, internal EEO complaints, and their removal allow an inference of, the proximity of allow an inference of causation? Okay. Because there's no evidence that Chief Rubin knew about the EEO complaints. Actually, there's two answers to that, and I'll, the first is that there's no evidence that he knew about them, and the second is, and I'll get to that in a moment, the fact that even if he had known about them, the plaintiffs have not actually disputed that Chief Rubin removed them because of the information. You're saying there's no argument of pretext, right? No argument of pretext. We have both prima facie case and pretext. Where do the EEO complaints go? Okay. And I'm actually going to head back to my desk and get a piece of paper for you on that. Okay. So there's a couple different processes at play, and EEO can tend to be confusing. This is not to be confused with, and I don't have a piece of paper, this is not to be confused with an EEOC complaint. Right, right. This is internal, I understand. This is internal. So there is somebody who is designated as the EEO officer, not necessarily a supervisor. There's regulations, and that's what I had over there, and I'll pick it up in a moment, outlining the process that they are supposed to do. Now, the regulation, and I see it, I'm going to grab it. Great, great, great. You're only keeping us from lunch, don't worry. There it is, there it is. I brought this for this particular reason. Okay. So DCMR 4-105.10, and all of 4-105 is about the EEO process, indicates that the EEO counselor should attempt to keep things confidential. So he conducts a confidential investigation. He can ask around, he or she. Now, the EEO officer may disclose to the head of the cited agency the circumstances surrounding the complaint, if they include safety, criminal actions, or patterns. But you're pointing to there's no evidence that that took place here. There's no evidence that it took place. It's not required to take place. I will also note that it is not at all clear what these EEO complaints actually said. The pages that are in the joint appendix that the plaintiffs identify as their EEO complaints are simply two pages of prose. They have no heading. They have no date. I believe one of them is unsigned. We know that the plaintiffs made race discrimination complaints because of the exit interview form, which is also in the appendix, which says there was a complaint of race discrimination. But there's no complaint of race discrimination in those two pages of prose. The word discrimination appears once, and it's just thrown out there along with all of these other complaints. What about the prose raising the concerns about, whistleblower concerns about the problems with evidence? Yeah, that is mentioned. You don't have to raise race to have the claim. Oh, that's correct. Oh, the district is not disputing that their EEO complaints were made, and that whether or not they include that page of prose, that they are protected. That they're protected disclosures. Yes, even if all they said was race discrimination and they didn't include the pages of prose, we would concede that that is protected disclosure. But what this court held in Talavera and what the D.C. Court of Appeals held in McFarland is that you can't have an inference of retaliation if the decision-maker did not know about the complaint. And in Talavera, there was much closer evidence that the decision-maker knew about the complaint. There, the employee made her EEO complaint, and she told another supervisor that she'd made the complaint. She provided evidence that that supervisor was very close and discussed personnel matters with the supervisor who took the action against her. And the action against her was taken one week later. And this court held that at summary judgment, that is not enough. That requires speculation. Here, all we know is that they made an EEO complaint to someone, to some EEO officer, who was never deposed, who never was asked who they told, and that a month later, Chief Rubin, or two months later, Chief Rubin, had a meeting with Robert Hildum. Robert Hildum said, we will not call you into the case of defamation. If you're an investigator and you're put on this Lewis list, what recourse does someone have? I do want to add something. There's some clarifications that are very important in this, not to the facts of this case, but to this court's conception of what they're calling a Lewis list. There is no Lewis list in the District of Columbia. Let's imagine the prosecutor comes to the chief and says, I don't want these folks. I'm not going to call these folks as witnesses anymore. Do they have any recourse to that? I mean, that seems like a pretty powerful tool the prosecutor can use. It is, and I don't know the answer to that. This record doesn't get into that. There's no due process claim here. I can point out a couple things. First of all, if somebody is going to lose their job as a result of the OAG's decision that they can't allow someone to testify, that person gets all of the process that the CMPA provides. It can't be a secret if they're going to lose their job because of it. So there's no property interest at play here. Certainly there's enough of an interest that if there were evidence of retaliation from a supervisor, it could lead to a whistleblower claim. But there's no constitutional claim here. Can the people in the OAG be determined to be supervisors for this purpose because they have this authority to, by debarring somebody from serving as a witness, essentially to recommend their removal from an investigative position? That's another question that we haven't investigated and briefed. I will say this. The line attorneys, absolutely not. They're not supervisors under the definition of supervisor in the Whistleblower Protection Act. And the plaintiffs here have, in fact, stepped away from their claim against Lynette Collins, which they also had forfeited. But when I pointed that out, that she wasn't a supervisor, they stepped away and said, oh, we're not saying she was responsible. Why wouldn't someone like her be a supervisor? If they have the power to have this effect on someone's career, why wouldn't that be a supervisor for purposes, these purposes? Because the Whistleblower Act defines supervisor. I think it does have the power to recommend that an action be taken. I think that an adverse action be taken. Sure. Yes, but let me respond to that a couple of ways. Because I want to draw the line between the line attorney, who the plaintiffs are not claiming retaliated against. They forfeited that in the district court. Then they stepped away from it in their reply brief. And Robert Hildum, who I think, even though the DCCA has never ruled on it, is a supervisor, even though he's not the investigator's supervisor. The court has never considered the question, but I suspect there could be a case where a supervisor from a different agency could in fact be found to have caused retaliation against someone from a different agency. But that's not, we don't have to decide that here. Absolutely not. There's no allegation that Robert Hildum did anything wrong. And more importantly, the Bridgewater case is almost a red herring here. Nothing happened after Bridgewater. The investigators were still called to testify after Bridgewater. It was after the K.A. case, after the documentation of false statements under oath. And do you agree with your opposing counsel that they brought up Bridgewater in connection with the 2008 employment action in the district court? Absolutely not. Okay. Absolutely not. I haven't been able to find any evidence of that. There's two pages that are cited in my brief that are the pages in which they have laid out what their claims are. And never in there did they claim that Lynette Collins did anything against them. And the EEO claims. That's not part of the, they didn't bring that under the whistleblower claim, did they? No, no, no. Those were just EEO. Now, they are claiming those are protected disclosures now. But, no, they were alleging race discrimination. But in the complaint. In the complaint. No. I don't believe so. No. I'll ask the opposing counsel. I've sorted out the record as thoroughly as I can, and I don't believe so. But here's the most important part. To the extent that there may be confusion about a prima facie case here, and what could lead to causation, and whether there's an inference, this Court doesn't need to reach any of that. Because the plaintiffs do not dispute that they engaged in the four acts of misconduct for which they were removed from the fire investigation unit. They do not dispute that they interviewed a minor for three hours without giving them Miranda warnings. They say they didn't think they needed to give them Miranda warnings. But they do not dispute that a judge excluded a confession to arson based on their actions. They do not dispute that they interviewed 25 witnesses without taking any notes. They do not dispute that they leaked confidential information to K.A.'s lawyer that included the address of a witness that K.A. had threatened to kill. And they do not dispute that Boyer either perjured himself at trial in K.A. or perjured himself when he signed an investigative report. There's no way that they can dispute those. And Robert Hilden, before he went to Chief Rubin, he very carefully went through and read the transcripts for these things. He looked at all of the evidence. If they can't challenge the truth of it, they can't challenge Rubin's reasonable belief in the truth. And so even if Rubin had known about their misconduct, and even if they hadn't forfeited all of these claims, and even if they'd acknowledged that Chief Rubin is the one who made the decision, they still could not establish a claim here. All right. Thank you. Thank you. How much time does Mr. Temple have? All right. Why don't you take a couple minutes? Can I ask you a question first? It's on my mind. I'm looking at the complaint right now, and I'm looking at count one of the complaint, violation of the Whistleblower Act. And as you said, that's the only issue in front of us now, right? Right. Okay. I can't find anywhere in there any reference of the EEO complaints. To help you here, I've highlighted paragraph 53. Plaintiffs have made protective disclosures to supervisors, the head of DCFEMS, OIG, OAG, AUSA, a member of the D.C. Council, prosecutorial officers, and the media. But I don't see any reference to the EEO complaints in there. And so I take it that's not part of your whistleblower. It is, and it was argued below. Where? It was argued by a council below relative to the EEO, the August EEO and brief below as well. As part of the whistleblower? Yeah, I know it was argued as part of your 1983 claim, but it wasn't brought as part of your whistleblower claim. And as we said, 1983 is not before us right now. The only thing is the whistleblower. So where below did you link it to the whistleblower claim, not the 1983 claim? It was argued and briefed, the EEO claims, and the court treated it accordingly as well. As a violation of the whistleblower protection? Not as a violation, as a disclosure. Right, as part of your whistleblower claim. Yes. Okay. I would note that for purposes of that disclosure as well, at A1083, relative to management's knowledge prior to even the whistleblower, prior to the complaint, there is a statement in the record that suggests that there had been a communication regarding missed columns by the appellants. And that statement says in the fifth paragraph there as follows, Sergeant Parker informed Investigator Boyer that he was on a conference call as well, and that OAG made it clear that they were sponsoring Pennington and Boyer only for this case, and that an investigation would be conducted into the other matter concerning AAG Collins after the KA case. The point of that reference is that there was, in fact, knowledge from the complaints of Boyer and Pennington about the Bridgewater case. And that knowledge existed prior to June, which is when this particular complaint was made. The point being is that, and there's one other point I want to close with. Counsel spends quite a bit of time talking about Hilden. And if you refer to Hilden's documents in his letters to, which were actually communicated to Rubin, Hilden's documentation is based exclusively on hearsay. There's nothing in the record below that substantiates what Hilden says. In fact, Hilden references transcripts that he relied upon. Those transcripts were not made part of the record. Hence, if, to the extent that there are protected disclosures, and we would underscore on the protected disclosures, that the nature of the history in terms of management's relationship to the appellant is one of hostility, given their prior complaints. So proximity is not the only issue relative to the disclosures, to the extent that there are disclosures that are ongoing in October, November, January, and we submit up through June, that if there is an angst, then our appellants meet their burden in terms of establishing a protected disclosure. When the burden shifts, the appellee has failed to establish by the required clear and convincing evidence that the legitimate business reason, or that what the appellants are arguing is pretextual in nature. And we say that the court, nonetheless, because of the credibility concerns, counsel leaps to the conclusion that the, and we disagree, that Mr. Boyer didn't respond, either in Bridgewater or in the K.A. case, relative to that there's a question as to whether he's perjuring himself. What is really happening here is because of the nature of the complaints by Mr. Boyer and Mr. Pennington early on to Mr. Graves and others, regarding these prosecutions, the fact that they're prosecuting people with missing evidence and they're not disclosing it, then there is a retaliation. Retaliation is not isolated purely to management. It's attorney-client. There is some relationships that are going on with the lawyers and management, Palmer, Lee, and others, and they know, the email history that we identified shows that they know that there's missing evidence. They show that there are disclosures. Brian Lee says, I learned this from Boyer. I learned it from Pennington in January 2008. So it's our position that we met that burden, and when the burden shifted, that the defendant, the appellant, Pelley, excuse me, did not and could not have met the burden, and that the credibility issues, they loom so large, particularly when it comes to Collins and Proctor, that the court should have sent that narrow issue to a jury for determination. Thank you. All right. Thank you.
judges: Henderson, Griffith, Millett